# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CAROL ANN GREATHOUSE,**

     **Plaintiff,**

**v.**                                                    **Case No.  8:08-cv-1170-T-30TGW**

**PREMIER BEVERAGE CO.,**

     **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Premier Beverage Company's ("Premier or Defendant") Motion for Final Summary Judgment and Memorandum of Law in Support (Dkt. 28) and Plaintiff's Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment (Dkt. 43).  The Court, having considered the motion, response, record evidence, and being otherwise advised in the premises, finds that Defendant's Motion for Final Summary Judgment must be denied with respect to Counts I and III and granted with respect to Count II.

## BACKGROUND

Plaintiff Carol Ann Greathouse ("Greathouse" or "Plaintiff") was employed by Defendant as a Merchandiser in its ABC Division beginning on or about May 29, 2001. Plaintiff's duties encompassed executing product displays, conducting wine tastings, and assisting in re-stocking shelves with products sold by Defendant to ABC liquor stores.  In

November 2002, Plaintiff became a Sales Trainee. Plaintiff's duties were essentially identical to her previous position. In June 2003, Plaintiff was promoted to the position of Sales Representative/Account Executive in Defendant's Albertsons Division. Plaintiff was initially assigned to the Tampa/Brandon territory. In that position, Plaintiff was responsible for the sale of wine and spirits to Albertsons stores. Plaintiff's job duties also included stocking shelves and cold boxes and executing product displays. In March 2004, Plaintiff transferred to the South St. Petersburg territory, which was closer to her home than the Tampa/Brandon territory.

Albertsons Division Sales Representatives were paid on a commission basis. Effective October 1, 2004, Defendant instituted a new pay structure for Albertsons Sales Representatives, which remained in place for the duration of Plaintiff's employment. Under this structure, all Sales Representatives were paid the same base subsidy and draw and earned the same rate of commission based on the amount of products they sold to Albertsons stores. Sales Representatives were assigned a certain number of stores in a specific geographic area. Stores were either labeled as SHV, for super-high volume; HV, for high volume; MV, for medium volume; or LV, for low volume sales. Because the commissions were based on sales, a Sales Representative's commissions were affected by whether his or her store was designated as SHV, HV, MV, or LV.

In October 2005, Plaintiff took a leave of absence related to her pregnancy and birth of her child. In December 2005, while she was on leave, Plaintiff contacted her supervisor, Field Sales Manager Tim Rice ("Rice"), and requested that she be permitted to transfer back

to the Tampa/Brandon territory that she had previously serviced. Rice pointed out to Plaintiff that the Tampa/Brandon area, historically, had generated less income than the South St. Petersburg area. According to Plaintiff, after Rice ran figures to determine the pay difference between the two areas, he found that it would only be about a $2,500 pay difference. According to Plaintiff, Rice also stated that she would most likely receive another store. According to Plaintiff, her decision to return to the Tampa/Brandon area was based on the assumption that her income would be the same given the fact that she would gain that additional store.[1] Plaintiff's transfer request was approved by Lopez. Plaintiff returned from her leave on February 24, 2006.

In June 2006, Plaintiff contacted Lopez and requested that she be given the Albertsons store in Sebring. Although it is not completely clear in the record, it appears that Plaintiff contacted Lopez after Lopez denied Rice's proposal to give the Sebring store to Plaintiff. According to Plaintiff, Lopez told her that Defendant had taken care of her and would not give her any additional stores because the managers in the stores she serviced did not like her and because, if she were to move or become pregnant again, it would be difficult to find another Sales Representative to cover the Sebring store. Lopez testified that he rejected

---

[1] Plaintiff testified that Rice represented that Plaintiff would be given the Sebring store because it was in a general market and no Albertsons person would take care of it. Rice testified that he did not have the authority to assign any stores to Plaintiff, although he did have the authority to make rerouting proposals that had been approved in the past. The Court notes this difference in testimony, not because it is material to the Court's ruling, but in order to accurately reflect any differences in the record. As set forth in more detail herein, Rice in fact did make a proposal to Senior Manager of Chain Sales Louis Lopez ("Lopez") that suggested giving Plaintiff the Sebring store.

Plaintiff's request because he could not justify taking the store away from another salesperson and it was too far away for Plaintiff to service properly. Lopez denied having referred to Plaintiff's maternity leave, or having told Plaintiff that Defendant had done enough for her and was not going to do anything more. According to Rice, he could not understand why Lopez refused to give the Sebring store to Plaintiff. Rice testified that Lopez had always approved his proposals in the past. Rice also suggested that Lopez's excuse regarding the Sebring store's location was disingenuous and was evidence of discrimination against Plaintiff. The record reflects evidence that Defendant had assigned stores to Sales Representatives that were located further away from the Sales Representative's territory than the Sebring store was to Plaintiff's territory. There is also evidence that Defendant had taken a store away from a female Sales Representative and given that store to a male Sales Representative.

Effective August 1, 2006, Albertsons closed a number of its Florida stores, including three in Plaintiff's territory. As a result of the store closings, Defendant decided to eliminate the position that was then held by Joe McIlvenna ("McIlvenna") and redistribute the remaining stores in his territory.[2] Lopez assigned one of those stores, which was located in Winter Haven where Plaintiff lived, to Plaintiff.

---

[2] McIlvenna was subsequently hired for a Sales Trainee position. It appears that Plaintiff's claims of discrimination include an allegation that she did not receive this position even though she was more qualified for the position. However, as set forth in more detail herein, it appears undisputed in the record that Plaintiff never applied for this position.

On October 12, 2006, Plaintiff called Human Resources Manager Ann Ring ("Ring") and reported that she was upset about a comment that Senior Manager of State Chain Sales Robert ("Bob") Quinones ("Quinones") made during a sales meeting the previous day. Ring instructed Plaintiff to put her complaint in writing. That same day, Plaintiff faxed her written statement to Ring, which stated in pertinent part[3]:

> This is the statement you requested from me, I hope as you stated on the phone, something can be done about the unfair treatment I have endured during the time I have came back to work, as you know I have spoke to you about some of the problems I having with the way Louis Lopez and Bob Quinones are treating me. I feel like as I've said before this is discrimination, I know you have spoke with Louis but you have never followed through nor have you returned my phone calls, I am under so much stress because of this unfair treatment, Tim Rice knows this is not right, he has stood up for me, putting his job on the line, as I said to you before I do not want my child to be held against me, so I hope this statement can be of help. On Oct. 11, 2006, during our state meeting, Bob Quinones was addressing our pay, In the middle of this speech he was stating different ways the company could maybe help by the first of the year and resolve some of our pay issues, out of nowhere he in harsh words he said my name and said here you go on maternity leave then come back and then you, he than said we'll get in to that later, I was very embarrassed and feel I was being discriminated against for this, I feel his action in front of people who I've never even met, was very uncalled for and he was out of line by doing this.

See Dkt. 40, Exhibit A. Ring solicited written statements from Rice, Lopez, and Quinones[4] and concluded that Quinones should receive a written corrective action. See Dkt. 43, DEFENSE 0661. It is unclear in the record why Quinones did not receive any kind of

---

[3] Portions of the statement appear to be cut off and are not completely clear, but are quoted here verbatim.

[4] Quinones testified during his deposition that what he said during the meeting was that Defendant had taken care of Plaintiff during her maternity leave, and had returned her territory to her in the same condition in which she had left it. He explained that, in making the statement, he was attempting to convey that Defendant takes care of its employees.

corrective action.  Ring testified that she recalled recommending some type of counseling, corrective action, sensitivity training, and an apology to Plaintiff.  In an email from Ring to Chris Nicolas, Quinones' supervisor, Ring states, in part:

> We are talking about an associate that was hit the hardest by the closure of the Albertson's stores and one that had asked for additional stores (that are currently NOT called on by an Albertson's team member).  Her current earnings are almost $20,000 below last year's and there has not been any additional alignment of stores to compensate.  There is a high level of frustration with the associate and unfortunately, Bob's [Quinones] comments have escalated this to what now appears to be a legal matter.

See Dkt. 43, DEFENSE 0661.  The email also suggested that Ring thought that more than a verbal counseling was called for given Quinones' 25 years of experience and the nature of the comments.  Id.  The record reflects that Quinones did not receive any kind of corrective action, was not sent to training for the incident, and never apologized to Plaintiff.  Moreover, Ring testified during her deposition that she never followed up to determine whether Quinones completed any of these actions.

On December 8, 2006, Ring emailed Lopez and Quinones, suggesting that Plaintiff should receive the Sebring store.  See Dkt. 43, DEFENSE 0684.  Ring states in the email: "Evaluation of the associate's earnings shows they are on track to earn approximately $20,000 less this year than last.  Understanding that there are several factors involved, this will at least help somewhat."  Id.  That same day, Quinones responded in an email that he and Lopez decided not to give the Sebring store to Plaintiff because it would be a 45-mile drive from Plaintiff's closest store to the Sebring store.  Id. at DEFENSE 0684.  In another email,

Quinones states: "I know you are trying to alleviate Carol's [Plaintiff] income issue, but this is not in our best interest." Id. at DEFENSE 0683.

In December 2006[5], Plaintiff filed a Charge of Discrimination with the EEOC. Plaintiff's Charge stated that Defendant changed the terms and conditions of her employment following her return from a three-month maternity leave and that when Plaintiff complained, Defendant told her that she was not in a position to complain since she was taken care of while she was out for three months. According to Plaintiff, immediately after she filed this Charge, beginning in early 2007, Lopez and Quinones started going to her stores, questioning the liquor managers about her performance, and making notes of items that needed to be resolved. Plaintiff testified during her deposition that Lopez and Quinones did this to harass her. Rice testified during his deposition that Lopez and Quinones subjected Plaintiff to constant scrutiny and "wanted to put the clamps on [Plaintiff]." See Rice's deposition at 58:7-15. Rice also testified that Lopez and Quinones were always trying to find ways to "write [Plaintiff] up" and that they were very disappointed when Rice would not write up Plaintiff. Id. at 65:12-25. Rice testified that it was obvious Lopez and Quinones had it out for Plaintiff and he suspected it was because Plaintiff reported Quinones' behavior at the October meeting. According to Defendant, Lopez and Quinones visited Plaintiff's stores more frequently than any others because her territory was in close proximity to their office. Quinones also testified that his decision to visit a store was based solely on location.

---

[5] Plaintiff subsequently amended her Charge to include a claim for retaliation against Defendant.

According to Plaintiff, Defendant also retaliated against her by assigning her additional tasks compared to other Sales Representatives and by requiring Plaintiff to document her absences when other Sales Representatives were not required to document absences.  Plaintiff testified that she believed Lopez was trying to get her to resign.  Rice testified that he believed Quinones and Lopez were discriminating against Plaintiff and that he had never been asked to demand that a Sales Representative complete documentation regarding absences other than with Plaintiff.  Rice also testified that Quinones told him to keep close track of Plaintiff's personal days and that Quinones only scrutinized Plaintiff.  According to Defendant, it has a policy that requires employees to notify their supervisors in advance if they are going to be absent from work.  Defendant also has a policy that medical documentation may be required for absences of three days or more.

In January 2008, Plaintiff received two additional stores when Sales Representative Glen Ables resigned and his territory was dissolved.  On February 25, 2008, all of the sales personnel in the Albertsons Division, including Plaintiff, were advised that the Division was closing and their positions were being eliminated effective March 1, 2008.  Neither Lopez nor Quinones were involved in the decision to close the Albertsons Division.

Plaintiff initiated this action against Defendant in May 2008.  Plaintiff's Amended Complaint alleges that Defendant subjected her to unlawful discrimination based on her sex and/or based on her pregnancy in the terms and conditions of her employment as compared to other similar employees who were male and/or who had not taken maternity or parental leave.  Specifically, Plaintiff claims that she received lower pay in comparison to her male

colleagues as a result of the assignments of stores among all of the Sales Representatives. Plaintiff's Amended Complaint also alleges unlawful discrimination based on Defendant's failure to consider her for open positions and that she was ignored for these opportunities based on her sex and due to her having taken an extended maternity leave. Plaintiff's Amended Complaint also alleges that Defendant retaliated against her after she filed her first Charge of Discrimination by: (1) subjecting her accounts to constant surveillance; (2) giving her additional tasks and assignments which were not assigned to others; (3) harassing her by calling her repeatedly when she was absent from work in October 2007 dealing with her daughter's medical issues; (4) demanding that she provide documentation when she was out sick for three days in December 2007; and (5) terminating her employment in February 2008.

Based on these allegations, Plaintiff asserts claims against Defendant for: (1) gender and pregnancy discrimination in violation of Title VII (Count I); (2) violation of the Equal Pay Act (Count II);[6] and (3) retaliation in violation of Title VII (Count III). Defendant's Motion for Summary Judgment moves for summary judgment on all of Plaintiff's claims.

## DISCUSSION

### I. Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled

---

[6] Plaintiff states in her opposition that she abandons her EPA claim. Thus, this Court will grant summary judgment on Count II.

to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  <u>Id</u>.  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  <u>Id.</u> at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  <u>Anderson</u>,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. <u>Fernandez v. Bankers Nat'l Life Ins. Co.</u>, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial."  <u>Warrior Tombigbee Transp. Co. v. M/V Nan Fung</u>, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 248; <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a

conflict in substantial evidence to pose a jury question.  Verbraeken v. Westinghouse Elec.

Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

## II.    Legal Analysis

### A.    Count I - Plaintiff's Claims of Discrimination under Title VII

The analysis of Plaintiff's claims will be determined not only by the nature of the

allegations but also by the quality of the evidence offered in support of those claims.  See

Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[t]he analytical

framework and burden of production var[y] depending on the method of proof chosen").  In

general, a plaintiff may attempt to establish a claim of illegal employment discrimination

through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.;

see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's ability

to proceed through the use of circumstantial evidence of discrimination is necessarily

important because direct proof of discrimination is uncommon.  See Combs v. Plantation

Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d

590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves

the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State

Community College, 908 F.2d 1512 (11th Cir. 1990); Wright v. Southland Corp., 187 F.3d

1287, 1293-94 (11th Cir. 1999) (defining direct evidence as "evidence from which a

reasonable trier of fact could find, more probably than not, a causal link between an adverse

employment action and a protected personal characteristic").  "Direct evidence is composed

of only the most blatant remarks, whose intent could be nothing other than to discriminate

on the basis of some impermissible factor." <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002) (quoting <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir. 1999)) (citations and quotations omitted).  However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." <u>Price Waterhouse v. Hopkins,</u> 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring) (1989); <u>see also</u> <u>EEOC v. Alton Packaging Corp.,</u> 901 F.2d 920, 924 (11th Cir. 1990) (quoting <u>Price Waterhouse</u>).

Here, Plaintiff has presented only circumstantial evidence of discrimination based on her sex and/or her pregnancy.  Specifically, Lopez's comment in June 2006 and Quinones' comment at the October meeting are insufficient to establish direct evidence of discrimination because an inference is required to conclude that these statements demonstrate an anti-pregnancy bias.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, Plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  <u>See</u> <u>id.</u> at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  <u>See</u>, <u>e.g.</u>, <u>Nix v. WLCY Radio/Rahall</u>

Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997) (discipline); Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55, 101 S.Ct. 1089; Chapman, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its

actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  <u>Combs</u>, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253, 101 S.Ct. 1089.  Given that the ultimate burden of persuasion always remains with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000); <u>Combs</u>, 106 F.3d at 1529-38.

Plaintiff alleges that Defendant discriminated against her by: (1) failing to give her additional stores after Defendant closed three stores in her territory; and (2) failing to consider her for a position in the ABC Division that was given to McIlvenna.  Defendant first argues that Plaintiff cannot establish that either of these allegations resulted in a serious and material change in the terms, conditions, or privileges of Plaintiff's employment, i.e., they do not constitute adverse employment actions.  The Court disagrees.  There is ample

evidence in the record that Plaintiff was making approximately $20,000 less during the year that she requested the Sebring store, a high-volume store, and that Defendant, specifically, Lopez and Quinones, refused to assign that store to Plaintiff.  It is axiomatic that under Defendant's compensation plan an additional store would have increased Plaintiff's income, which is supported in the record.  Thus, Defendant's failure to give the Sebring store to Plaintiff had an adverse effect on a term or condition of Plaintiff's employment.  See Gillis v. Ga. Dep't of Corrs., 400 F.3d 883, 887 (11th Cir. 2005) ("actions that affect compensation are considered adverse employment actions"); Standifer v. Sonic-Williams Motors, LLC, 401 F. Supp. 2d 1205, 1215 -1219 (N.D.Ala. 2005) (holding that employer's removal of additional products, which prevented Plaintiff from receiving commission from these items constituted an adverse employment action).

There is also evidence in the record that suggests that Plaintiff would have made more money in the Sales Trainee position that was given to McIlvenna.  Defendant argues that since this job was a position with "lesser pay, responsibilities, or prestige" it cannot be adverse.  However, Rice testified during his deposition that McIlvenna was making more than Plaintiff, despite the fact that the Sales Trainee position was not at the same level as a Sales Representative.  Thus, there is a material disputed fact in the record as to whether the failure to provide Plaintiff with the Sales Trainee position was an adverse employment action.

Defendant next argues that Plaintiff cannot establish that she was treated less favorably than similarly-situated male employees with respect to Defendant's decision not

to provide Plaintiff with additional stores and with respect to Defendant's decision to give the Sales Trainee position to Joe McIlvenna. The Court disagrees. Importantly, with respect to this element, Plaintiff is not required to point to a specific individual by name, but she must at least assert that a person outside her protected class was treated more favorably than herself regarding these decisions. See Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir. 1998). The record reflects that Plaintiff has met this burden. Rice's deposition reflects that all of his proposals regarding the assignment of stores for Sales Representatives in his division had been approved prior to his proposal that Plaintiff should be given the Sebring store. The record also reflects that male Sales Representatives had been assigned stores that were located further away than the Sebring store was from Plaintiff's location and that Defendant had taken a store away from a female Sales Representative in order to give the store to a male Sales Representative. Moreover, Plaintiff identified McIlvenna, Mark Harris, Carlo Giglio, and Jim Moyer as Sales Representatives who were similarly situated and were treated more favorably. Although Defendant could not necessarily determine the volume of the stores, Defendant did have control over the assignment of the stores and the record contains material disputed facts regarding Defendant's decision not to give Plaintiff additional stores, a decision that directly related to Plaintiff's compensation, and Defendant's treatment of the other Sales Representatives, who were similarly situated to Plaintiff and outside her protected class.

With respect to the Sales Trainee position, which was given to McIlvenna, both Plaintiff and McIlvenna were Sales Representatives at the time that McIlvenna was given the

position. However, McIlvenna's position was eliminated prior to Defendant's decision to give him the Sales Trainee position. Moreover, it appears that Plaintiff never applied for the Sales Trainee position. Thus, the Court does not find that Plaintiff has met her burden with respect to identifying how she was similarly situated to McIlvenna.

Defendant's last argument with respect to Plaintiff's discrimination claims is that it had legitimate nondiscriminatory reasons for its actions and that Plaintiff cannot demonstrate pretext. The Court agrees with respect to Plaintiff's claim that she was not given the Sales Trainee position. As set forth herein, Plaintiff does not present any evidence to rebut Defendant's claim that she was not given the Sales Trainee position because she never applied for the position. Thus, this claim of discrimination must fail.

With respect to Defendant's decision not to give Plaintiff the Sebring store, Defendant argues that it is undisputed that the decision was based on the "store's remote location and the fact that it was already being serviced by a Sales Representative in the General Market Division." The Court disagrees that this is undisputed and finds that Plaintiff has met her burden in demonstrating pretext. The record reflects that Lopez and Quinones may have invented these reasons because they did not want to give Plaintiff the store, based on either her previous pregnancy, or the fact that she was female. There are the June and October statements made by Lopez and Quinones that reference Plaintiff's maternity leave. Rice also testified that Lopez's reasons for not giving Plaintiff the Sebring store did not make sense and that all of Rice's previous recommendations had been approved regarding store assignments. There is also evidence that stores had been given to other Sales Representatives

that were equally as remote as the Sebring store was from Plaintiff's territory, which casts doubt on Lopez and Quinones' location concern. Also, there is evidence that Defendant had, on at least one occasion, taken a store away from one Sales Representative in order to give it to another Sales Representative, which also casts doubt on Defendant's reason that the store was already being serviced. All of this evidence places doubt on Defendant's nondiscriminatory reasons. Accordingly, Defendant's Motion for Summary Judgment as to Count I must be denied.

### B.    Count III - Plaintiff's Claims of Retaliation

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); Butler v. Alabama Dep't of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that she engaged in statutorily protected activity, she suffered a materially adverse action, and there was some causal relation between the two events."). Plaintiff's burden of establishing a *prima facie* case is not heavy. See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

Plaintiff claims that Defendant retaliated against her after she filed her first Charge of Discrimination by: (1) subjecting her accounts to constant surveillance; (2) giving her additional tasks and assignments which were not assigned to others; (3) harassing her by

calling her repeatedly when she was absent from work in October 2007 dealing with her daughter's medical issues; (4) demanding that she provide documentation when she was out sick for three days in December 2007; and (5) terminating her employment in February 2008.

Defendant first argues that, of these challenged actions, only Plaintiff's termination qualifies as materially adverse. In 2006, the Supreme Court decided <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), which unveiled an expansive adverse action standard under which a Title VII retaliation plaintiff need show only that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 126 S.Ct. at 2415. The Eleventh Circuit examined and applied <u>Burlington</u> in <u>Crawford v. Carroll</u>, 529 F.3d 961 (11th Cir. 2008). The <u>Crawford</u> panel deemed the <u>Burlington</u> standard to be "decidedly more relaxed" and a "more liberal view" of the adverse action needed to sustain a Title VII retaliation cause of action than that adopted by this Circuit previously. <u>Id.</u> at 973-74. In that regard, the appellate court explained that, "[u]nder the holding of <u>Burlington</u>, the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." <u>Id.</u> at 973. The appellate court noted that a retaliation plaintiff is no longer required to show "either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation

claim." Id. at 974.  Significantly, the <u>Crawford</u> panel construed <u>Burlington</u> as "strongly suggest[ing] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered materially adverse to him and thus constitute adverse employment actions." Id. at 974 n. 14.

Defendant relies on cases that were decided prior to <u>Burlington</u> to argue that the allegations of constant scrutiny and the assignment of additional tasks are "petty slights or minor annoyances" that do not constitute adverse action.  Under the <u>Burlington</u> standard, however, the Court concludes that a jury could properly determine that a reasonable employee would have found these alleged acts, taken in the aggregate, to be materially adverse, such that a reasonable employee well might have been dissuaded by those acts from making or supporting a charge of discrimination against the employer.  Plaintiff presented evidence that Lopez and Quinones constantly scrutinized her to the point of harassment and gave her additional tasks.  Rice testified during his deposition that Lopez and Quinones were looking for reasons to have Rice write-up Plaintiff and that Lopez and Quinones' scrutiny of Plaintiff was not how they treated the other Sales Representatives.  Rice also testified that Defendant's treatment of Plaintiff with respect to her absences and the care of her daughter were not normal, despite Defendant's written policies regarding absences.  All of this evidence, taken in the aggregate, is sufficient to constitute adverse employment action under the <u>Burlington</u> standard.  <u>See also Shears v. Mobile County Revenue Com'n</u>, 2008 WL 4493234, *6 (S.D.Ala. Oct. 3, 2008).

Defendant next argues that there is no evidence of a causal connection between Plaintiff's having filed a charge of discrimination in December 2006 and the alleged retaliatory actions. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Gupta, 212 F.3d at 590 (citation omitted); see also Goldsmith, 513 F.3d at 1278 ("We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citation omitted).

Close temporal proximity is not the only means by which a plaintiff can establish a causal connection. To the contrary, courts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are linked by a chain of intervening retaliatory acts. See, e.g., Bass, 256 F.3d at 1117-19 (deeming causal connection element satisfied even though adverse action occurred more than one year after EEOC charge, where retaliatory acts commenced shortly after charge was filed); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998) (causal connection requirement satisfied where "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge"); Odom v. Mobile Infirmary, 2008 WL 748398, *10 (S.D.Ala. Mar. 17, 2008) (causal connection element was established even though plaintiff was fired seven months after protected activity, where "the chain of retaliatory treatment commenced immediately after she complained").

Taken in the light most favorable to Plaintiff, the record reflects that Lopez and Quinones began a campaign of retaliatory activity in early 2007, right after Plaintiff filed her charge of discrimination, including subjecting Plaintiff to constant scrutiny, trying to find ways to have Rice write-up Plaintiff, taking an interest in Plaintiff's absences, and requiring documentation of same, and giving Plaintiff additional tasks[7]. All of these acts occurred within a twelve-month period, and demonstrate a plausible chain of retaliatory conduct. Ring warned Quinones in an email dated October 30, 2006, that "any adverse actions towards Ms. Greathouse [Plaintiff] because of this complaint could be construed as retaliation and could result in further action against you." See Dkt. 43 at DEFENSE 0659-0660. Rice testified that Lopez and Quinones were subjecting Plaintiff to additional scrutiny because of Plaintiff's complaint about Quinones, stating "[i]t was so obvious that they were out for her. I am not stupid." Rice deposition at 71:2-4. Thus, reading the causal connection requirement broadly, as the Eleventh Circuit requires, this sequence of events is sufficient to establish the third element of Plaintiff's *prima facie* case, in that the alleged retaliatory acts and protected activity are not wholly unrelated.

Defendant's last argument is that it has legitimate, nondiscriminatory reasons to validate all of the alleged acts of retaliation and that Plaintiff cannot prove that these reasons are pretextual. Specifically, Defendant states that the alleged scrutiny of Plaintiff's stores

---

[7] The Court does not find any evidence in the record supporting a link between Plaintiff's charge of discrimination and her termination. However, this will be discussed in more detail below, because even assuming, *arguendo*, that Plaintiff could establish causation, Plaintiff cannot demonstrate that Defendant's proffered reason for her termination was pretext.

occurred because the stores were conveniently located near Defendant's Tampa office and because the liquor manager at the Bloomingdale Road store had complained to them in 2006 about Plaintiff's dependability and service. As to Plaintiff's complaint about being assigned additional tasks and about the alleged harassment with respect to providing medical documentation for absences, Defendant argues that it was following its policies. With respect to Defendant's decision to close the Albertsons Division, Defendant argues that this decision was made by Defendant's upper management and was motivated by a desire to reduce expenses.

The Court agrees that Plaintiff has not met her burden with respect to her termination. Plaintiff has not pointed to any evidence in the record that rebuts Defendant's reason regarding her termination. Everyone in the Albertsons Division was affected and the decision was made by upper management. Thus, Plaintiff has not met her burden with respect to her termination.

With respect to the other retaliatory actions, which have been discussed at length herein, Plaintiff has demonstrated evidence of pretext. As set forth herein, there is evidence in the record from which a jury could find that Lopez and Quinones were intentionally scrutinizing Plaintiff because they had it out for her, given her complaint about Quinones' statement at the October meeting. There is also evidence in the record that Defendant did not follow its policies regarding absences and requested documentation only for Plaintiff. And, there is evidence to suggest that only Plaintiff was given additional tasks to perform and

that Lopez and Quinones did not take an interest in what the other Sales Representatives were doing at their stores. Rice testified that Plaintiff was an exemplary employee and was always one of the first Sales Representatives to get her stores in compliance. Accordingly, Defendant's Motion for Summary Judgment must be denied as to Count III.

It is therefore ORDERED AND ADJUDGED that Defendant's Motion for Final Summary Judgment and Memorandum of Law in Support (Dkt. 28) is hereby DENIED with respect to Counts I and III and GRANTED with respect to Count II.

**DONE** and **ORDERED** in Tampa, Florida on October 21, 2009.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2008\08-cv-1170.msj.frm